## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | **Chapter 7** |
| | : | |
| **SHARMIL MCKEE,** | : | **Bankruptcy No. 17-10941-AMC** |
| | : | |
| **Debtor** | : | |
| _____ | : | |
| **PENNSYLVANIA LAWYERS FUND** | : | |
| **FOR CLIENT SECURITY,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | **Adversary No. 20-00270-AMC** |
| | : | |
| **v.** | : | |
| | : | |
| **SHARMIL MCKEE,** | : | |
| | : | |
| | : | |
| **Defendant** | : | |
| _____ | : | |

Ashely M. Chan, United States Bankruptcy Judge

### OPINION

## I.      INTRODUCTION

Prior to commencing this bankruptcy proceeding, Sharmil McKee ("Debtor"), a formerly

licensed attorney, provided legal representation to three clients – Sansom Joseph ("Mr. Joseph"),

Lisa Gregg ("Ms. Gregg"), and Martha Watkins ("Ms. Watkins," collectively with Mr. Joseph

and Ms. Gregg, "Claimants"). Debtor subsequently faced disciplinary proceedings initiated

against her by the Pennsylvania Office of Disciplinary Counsel ("Disciplinary Counsel") in

connection with the legal representation she provided to the Claimants. Furthermore, dissatisfied

with the representation that they had received in various respects, and contending that Debtor's

representation caused them certain financial losses, Mr. Joseph, Ms. Gregg, and Ms. Watkins all

filed claims for reimbursement with the Pennsylvania Lawyers Fund for Client Security

("Fund"). In exchange for reimbursement for their losses, all three Claimants subrogated to the Fund the right to pursue any claims against the Debtor which they may have.

The Fund subsequently filed this adversary proceeding which seeks to have the claims of Mr. Joseph, Ms. Gregg, and Ms. Watkins declared nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4), and/or (a)(7), based upon alleged misconduct the Debtor committed during her representation of the Claimants. As explained in more detail below, because Debtor obtained money from all three Claimants by false pretenses, their claims are nondischargeable pursuant to § 523(a)(2)(A). Additionally, because Debtor's mishandling of certain funds entrusted to her care as a fiduciary by Ms. Gregg and Mr. Joseph created a debt for defalcation while acting in a fiduciary capacity, portions of their claims, as described below, are nondischargeable pursuant to § 523(a)(4). Finally, because Debtor's state law obligation to reimburse the Fund for amounts it paid to her former clients, plus 10% interest per annum, to have her law license reinstated constitutes a penalty payable to a governmental entity that is not compensation for actual pecuniary loss, Mr. Joseph's claim, as the only claim the Fund paid pre-petition, plus 10% interest per annum, is also nondischargeable under § 523(a)(7).

## II.     FACTUAL AND PROCEDURAL BACKGROUND

In 2005, Debtor was admitted to practice law in the Commonwealth of Pennsylvania as a licensed attorney. Trial Tr. 105:17-20, Aug. 25, 2022 ("Trial Tr."); Pl. Ex. 5 ¶ 2. On February 16, 2016, the Disciplinary Counsel, which investigates and prosecutes complaints submitted regarding attorneys practicing law in Pennsylvania,[1] filed a petition charging the Debtor with professional misconduct in ten separate matters ("Attorney Discipline Petition"), including legal matters involving her representation of Mr. Joseph and Ms. Gregg. Pl. Ex. 5 ¶¶ 1, 5; Trial Tr.

---

[1] After a complaint is filed against an attorney, the Disciplinary Counsel investigates the complaint and if warranted, the Disciplinary Counsel sends to the attorney a "request for statement of respondent's position." Trial Tr. 44:12-16.

43:17-22. On April 1, 2016, Debtor filed an answer to the Attorney Discipline Petition in which

she admitted the factual allegations contained therein but requested to be heard in mitigation. Pl.

Ex. 5 at 1-2. On June 30, 2016, a hearing was held before a District I Hearing Committee on the

Attorney Discipline Petition where Debtor, represented by Glenn Brown, Esq. ("Attorney

Brown"), testified and offered the testimony of an expert witness. *Id.* at 2. The Disciplinary

Counsel offered into evidence at that hearing Debtor's admissions and documentary exhibits to

satisfy its burden of establishing by a preponderance of clear and satisfactory evidence that

Debtor's actions constituted professional misconduct. *See id.* at 18.

On August 16, 2016, Mr. Joseph signed a "Subrogation Agreement and Assignment of

Claims" ("Joseph Subrogation Agreement") with the Fund, a body "created by the Supreme

Court of Pennsylvania in order to recompense victims of attorneys who have misappropriated

and converted client money or property during the course of an attorney/client relationship or a

fiduciary relationship customary to the practice of law." Pl. Ex. 3; Trial Tr. 7:18-22. The Joseph

Subrogation Agreement provides that

> [t]he above-named Claimant presented a request to the Pennsylvania Lawyers
> Fund for Client Security Board of the Supreme Court of Pennsylvania…for
> payment by [the Fund] toward reimbursement of a loss sustained by Claimant by
> reason of the dishonest conduct of Sharmil D. McKee (hereinafter called the
> 'Covered Attorney'), a member of the Bar of the Supreme Court of Pennsylvania,
> whom the Claimant had employed as his/her attorney in a transaction which is
> described in the Statement of Claim filed with [the Fund]. The amount of the loss
> alleged was $4,500.
>
> [The Fund], after investigation, has approved the claim in the amount of $7,000
> and has authorized payment of $7,000 to the Claimant.
> …
> In consideration of the foregoing, and only to the extent of payment received by
> me from [the Fund], and intending to be legally bound, I hereby subrogate [the
> Fund] to all of the rights, claims and interest which I may have against the
> Covered Attorney…and authorize [the Fund] to sue, compromise or settle in my
> name or otherwise all such claims and to execute and sign releases and

> acquittances and endorse checks or drafts given in settlement of such claims in
> my name, with the same force and effect as if I executed or endorsed them.

Pl. Ex. 3.

By way of background, when the Fund receives a claim from a former client of an attorney, the

Fund provides notice to the attorney named on the claim form, gives the attorney an opportunity

to respond, performs an independent investigation, and prepares the information from the

investigation for review and disposition by the Board of the Fund.[2] Trial Tr. 7:23-8:8.

Meanwhile, by order dated October 5, 2016, effective November 4, 2016, the Supreme

Court of Pennsylvania placed Debtor on administrative suspension for non-payment of her

attorney license fee. Pl. Ex. 5 ¶ 3. On December 16, 2016, following the submission of post-

hearing briefs by both Debtor and the Disciplinary Counsel, the Hearing Committee filed a

report concluding that Debtor had violated the rules as contained in the Attorney Discipline

Petition and recommending that she be suspended from the practice of law for two years. *Id.* at 2.

On February 9, 2017, Debtor filed a pro se voluntary petition for relief under chapter 7 of

the Bankruptcy Code. Case No. 17-10941 ECF Doc. No. ("ECF") 1, 4. Debtor did not schedule

any claims held by Mr. Joseph or Ms. Gregg and did not provide them with notice of the filing.[3]

*See id.* at ECF 15.

On April 28, 2017, the Disciplinary Board for the Supreme Court of Pennsylvania

("Disciplinary Board") "adjudicated" the Attorney Discipline Petition. Pl. Ex. 5 at 2. On June 8,

2017, an order was entered in Debtor's bankruptcy case granting her a discharge. Case No. 17-

---

[2] The Board is overseen by the Supreme Court of Pennsylvania. Trial Tr. 25:2-3. The Fund itself is its own entity. *Id.* at 25:3-4.
[3] There is an obligation scheduled on Schedule F in the amount of $600 to the "Pa Attorney Registration" for "Business" at 601 Commonwealth Ave., Suite 5600, Harrisburg, PA, which appears to relate to Debtor's non-payment of her annual attorney registration fee referenced *supra*.

10941 ECF 50. On July 7, 2017, an order was entered approving the chapter 7 trustee's report of

no distribution and closing the bankruptcy case. *Id.* at ECF 52.

Also on July 7, 2017, the Disciplinary Board issued a report and recommendation

pursuant to Pa. R. D. E. 208(d)(2)(iii) in connection with the Attorney Discipline Petition to the

Supreme Court of Pennsylvania making certain findings regarding the misconduct the

Disciplinary Counsel had charged Debtor with, and recommending that Debtor be suspended

from the practice of law for two years and that the expenses incurred in the investigation and

prosecution be paid by her ("Report and Recommendation"). Pl. Ex. 5 at 1, 24. Ultimately, the

Disciplinary Board concluded in the Report and Recommendation that the Disciplinary Counsel

had met its burden through the submission of admissions, documentary evidence, and Debtor's

testimony that Debtor violated the rules as charged in the Attorney Discipline Petition[4] and that

Debtor had not met her burden of establishing that her misconduct was caused by a psychiatric

disorder. *Id.* at 18, 19.

With respect to Mr. Joseph, the Disciplinary Board found in the Report and

Recommendation that:

> 31. [Debtor] agreed to represent Sansom Joseph pursuant to a written fee
> agreement dated July 24, 2009, for a fixed fee of $1,500.00.
> 32. On January 18, 2010, in the Court of Common Pleas of Philadelphia County,
> [Debtor] filed suit on behalf of her client in *Joseph v. East West Realty Group,*
> *LLC et. al.,* 0110 No. 1902.
> 33. On September 1, 2010, [Debtor] took a default judgment against the defendant
> in the amount of $206,000.00 ["Joseph Default Judgment"].
> 34. [Debtor] told Mr. Joseph that she would agree to collect the judgment for an
> additional fee of $2,500.00 plus a contingency fee of 20% of the gross amount
> collected on the judgment.
> 35. On September 20, 2010, Mr. Joseph paid [Debtor] with a check for $2,500.00.
> 36. Thereafter, Mr. Joseph gave [Debtor] two checks noted in the memo section
> as 'Sheriff fee.' The first check, dated October 29, 2010, was for the amount of

---

[4] Specifically, the Report and Recommendation concluded that Debtor had violated Pennsylvania Rules of
Professional Conduct 1.1, 1.3, 1.4(a)(1), 1.4(a)(2), 1.4(a)(3), 1.4(a)(4), 1.15(b), 1.15(c), 1.15(e), 1.15(i), 4.1(a),
8.4(c), 8.4(d), and Pennsylvania Rules of Disciplinary Enforcement 203(b)(7), 221(g). Pl. Ex. 5 at 15-17.

$2,500.00 The second check, dated March 3, 2011, in the amount of $2,000.00, was also identified on the instrument as 'for Sheriff fee.'

37. [Debtor] deposited both checks in the Police and Fire Credit Union account, a non-IOLTA account.

38. On several occasions subsequent to March 3, 2011, Mr. Joseph sought information from [Debtor] concerning the status of his matter on the payment of the sheriff's fees. He received no information or response from [Debtor].

39. [Debtor] made no further efforts to enforce the judgment in favor of her client.

40. Mr. Joseph subsequently sought new counsel.

41. [Debtor] wrote to Mr. Joseph's new counsel that Mr. Joseph had not paid her the $10,000.00 (the balance of the fee [Debtor] claimed that she and Mr. Joseph had orally agreed upon) and when [Debtor] received that money she would proceed to execute on his judgment.

42. [Debtor] offered to settle her dispute with Mr. Joseph by offering to 'waive' the balance of her claimed unpaid fee against Mr. Joseph while keeping the balance already paid, even though she had done nothing to earn any of the fee in her possession and did not offer to return the monies forwarded to her that had been described as 'sheriff fees.'

*Id.* at ¶¶ 31-42.

With respect to Ms. Gregg, the Disciplinary Board found in the Report and Recommendation that:

67. Lisa Gregg retained [Debtor] to represent her in two separate matters, one against DirecTV and one against Ms. Gregg's landlord.

68. [Debtor] agreed to represent Ms. Gregg *pro bono* in the landlord/tenant action.

69. [Debtor] agreed to charge Ms. Gregg $1,500.00 for the DirecTV matter.

70. [Debtor] collected a settlement in the amount of $10,000.00 on behalf of her client against DirecTV. Further, DirecTV agreed to remove a $900.00 improper delinquency charge on Ms. Gregg's credit report.

71. [Debtor] has retained the full proceeds of the settlement and has refused to communicate with Ms. Gregg about the matter on the telephone or in response to written communications.

72. [Debtor] provided Ms. Gregg with a list of costs in excess of $22,000.00 that [Debtor] claimed she had expended in the prosecution of Ms. Gregg's matter.

73. [Debtor] did not provide copies of any of the alleged bills or canceled checks she issued in payment of the alleged bills and has not paid over any of the proceeds of the settlement to Ms. Gregg.

*Id.* at ¶¶ 67-73.

Finally, in the Report and Recommendation, the Disciplinary Board commented on the testimony

of the behavioral health expert, Martha Durkin ("Ms. Durkin"), offered by Debtor in her defense

at the disciplinary hearing held in connection with the Attorney Discipline Petition, finding:

> 87. Ms. Durkin is a social worker and licensed therapist and has been employed by Evergreen Counseling and Psychological Associates since 1995.
> 88. Ms. Durkin credibly testified that [Debtor] sought counseling with Ms. Durkin in the spring of 2015 as a result of anxiety, which manifested itself in symptoms such as insomnia, change in appetite, confusion about decision-making, insecurity, and other physical symptoms.
> 89. Ms. Durkin testified that [Debtor] informed her at the first meeting that she had disciplinary allegations pending against her, but Ms. Durkin further testified that she and [Debtor] never discussed the allegations during the course of therapy. Ms. Durkin testified she did not know the details of the misconduct that [Debtor] engaged in.
> 90. Ms. Durkin testified that [Debtor] experienced changes in her life connected with the birth of her child in 2010, the onset of single parenthood, and a difficult custody situation with the child's father.
> 91. Ms. Durkin diagnosed [Debtor] with adjustment disorder, with mixed emotions of anxiety and depression, generally considered as external stress-related disorders.
> 92. Ms. Durkin testified that [Debtor] was not receptive to the idea of medication, so they did not explore that option. Instead, Ms. Durkin developed strategies for [Debtor] to deal with the stresses caused by her personal life.
> 93. [Debtor] treated with Ms. Durkin until the fall of 2015. At that time, [Debtor] could no longer afford treatment.
> 94. Ms. Durkin testified that she cannot relate specifically [Debtor's] emotional health to her professional misconduct.
> 95. Ms. Durkin testified that [Debtor's] anxiety should not impair [Debtor's] understanding of right and wrong.
> 96. Ms. Durkin testified that [Debtor] did not resolve her issues as a result of therapy.

*Id.* at ¶¶ 87-96.

On September 30, 2017, subsequent to the issuance of the Report and Recommendation,

Ms. Gregg signed a "Subrogation Agreement and Assignment of Claims" ("Gregg Subrogation

Agreement") with the Fund providing that:

> [t]he above-named Claimant presented a request to the Pennsylvania Lawyers Fund for Client Security Board of the Supreme Court of Pennsylvania…for payment by [the Fund] toward reimbursement of a loss sustained by Claimant by

reason of alleged dishonest conduct of Sharmil D. McKee (hereinafter called the 'Covered Attorney'), a member of the Bar of the Supreme Court of Pennsylvania, whom the Claimant had employed as his/her attorney in a transaction which is described in the Statement of Claim filed with [the Fund]. The amount of the loss alleged was $10,000.00.

[The Fund], after investigation, has approved the claim and has authorized payment of an award in the amount of $8,7000.00 in connection with this claim. …
In consideration of the foregoing, and only to the extent of payment made by [the Fund], and intending to be legally bound, I hereby subrogate [the Fund] to all of the rights, claims and interest which I may have against the Covered Attorney…and authorize [the Fund] to sue, compromise or settle in my name or otherwise all such claims and to execute and sign releases and acquittances and endorse checks or drafts given in settlement of such claims in my name, with the same force and effect as if I executed or endorsed them.

Pl. Ex. 4.

On October 18, 2017, the Supreme Court of Pennsylvania entered an order providing "…upon consideration of the Report and Recommendations of the Disciplinary Board, [Debtor] is suspended for two years from the Bar of this Commonwealth. [Debtor] shall comply with all the provisions of Pa.R.D.E. 217 and shall pay costs to the Disciplinary Board pursuant to Pa.R.D.E. 208(g)." Pl. Ex. 6.

On September 24, 2018, the Disciplinary Counsel and Debtor, represented again by Attorney Brown, filed with the Supreme Court of Pennsylvania a joint petition in support of discipline on consent bringing five charges of misconduct against Debtor, including in connection with representation she had undertaken for Ms. Watkins ("Joint Petition"). Trial Tr. 45:16-25. Debtor did not deny the charges involving Ms. Watkins. *Id.* at 46:15-18. Ms. Watkins had not been notified of the Debtor's now-closed chapter 7 bankruptcy case and had not been scheduled as a creditor.

8

On November 7, 2018, the Supreme Court of Pennsylvania entered an order granting the

Joint Petition and suspending Debtor from the practice of law for one year and one day,

consecutive to her prior two-year suspension. *Id.* at 46:19-25.

On July 22, 2019, Ms. Watkins signed a "Subrogation Agreement and Assignment of

Claims" ("Watkins Subrogation Agreement") with the Fund providing that:

> [t]he above-named Claimant presented a request to the Pennsylvania Lawyers
> Fund for Client Security Board of the Supreme Court of Pennsylvania…for
> payment by [the Fund] toward reimbursement of a loss sustained by Claimant by
> reason of alleged dishonest conduct of Sharmil D. McKee (hereinafter called the
> 'Covered Attorney'), a member of the Bar of the Supreme Court of Pennsylvania,
> whom the Claimant had employed as his/her attorney in a transaction which is
> described in the Statement of Claim filed with [the Fund]. The amount of the loss
> alleged was $1,650.00.
>
> [The Fund], after investigation, has approved the claim and has authorized
> payment of an award in the amount of $1,650.00 in connection with this claim.
> …
> In consideration of the foregoing, and only to the extent of payment made by [the
> Fund], and intending to be legally bound, I hereby subrogate [the Fund] to all of
> the rights, claims and interest which I may have against the Covered
> Attorney…and authorize [the Fund] to sue, compromise or settle in my name or
> otherwise all such claims and to execute and sign releases and acquittances and
> endorse checks or drafts given in settlement of such claims in my name, with the
> same force and effect as if I executed or endorsed them.

Pl. Ex. 2.

On August 12, 2020, the Fund filed a motion to reopen the Debtor's bankruptcy case in

order to permit the Fund to file an adversary proceeding, largely in its capacity as the subrogee of

the Claimants, contesting the dischargeability of the amounts paid by the Fund to the Claimants

(collectively, "Subrogated Claim Amounts") since the Claimants never received notice of the

bankruptcy prior to its closing ("Motion to Reopen").[5] Case No. 17-10941 ECF 121 ¶¶ 8, 11, 12,

---

[5] "Under Pennsylvania law, subrogation is an equitable doctrine which involves *substituting* one entity to a claim, demand or right of another entity." *Pa. Lawyers Fund for Client Sec. v. Baillie (In re Baillie),* 368 B.R. 458, 465 (Bankr. W.D. Pa. 2007). "The substituted party succeeds to the rights of the other entity, including any remedies available to the other entity." *Id. "*A subrogee's rights rise no higher than do the rights of its subrogor." *Id.* at 466.

13, 15, 16. On September 16, 2020, after a hearing on the Motion to Reopen on the same date, the Court entered an order granting the Motion to Reopen over the objection of Debtor, who had since retained Attorney Brown to represent her in opposing the Motion to Reopen.[6] *Id.* at ECF 124, 130, 131.

On November 17, 2020, the Fund filed a complaint objecting to the dischargeability of the Subrogated Claim Amounts plus 10% interest per annum. Case No. 20-270 ECF 1. Subsequently, on January 11, 2021, the Fund filed an amended complaint ("Amended Complaint"). *Id.* at ECF 7. The Amended Complaint's factual allegations relating to Mr. Joseph's claim and Ms. Gregg's claim largely mirror the findings contained in the Report and Recommendation respecting Debtor's misconduct in connection with her representation of Mr. Joseph and Ms. Gregg. *Id.* at ¶¶ 8-14, ¶¶ 21-31.

With respect to Ms. Watkins, the Amended Complaint alleges that Ms. Watkins hired Debtor to represent her in a civil matter involving real estate located in Delaware County, Pennsylvania for which she paid Debtor $1,650. *Id.* at ¶¶ 39-40. According to the Fund, Debtor filed a civil action captioned *Watkins v. Kimble, et al.,* in the Philadelphia County Court of Common Pleas and was later notified by that court that she had initiated the civil action in the wrong jurisdiction. *Id.* at ¶¶ 41-42. The Amended Complaint goes on to further allege that Debtor filed a petition for change of venue in the Philadelphia County Court of Common Pleas, which was granted, and Debtor took no further action on behalf of Ms. Watkins in the matter

---

[6] In granting the Motion to Reopen, the Court reasoned, as expressed to the parties in open court, that neither the Claimants nor the Fund had received notice of the bankruptcy filing in time to request a timely determination of the dischargeability of their respective claims, as the Claimants themselves were not scheduled, and neither was the Fund. As mentioned *supra,* only Pennsylvania Attorney Registration, a different entity with a different address from the Fund, seemingly relating to a debt for non-payment of annual attorney registration fees, was scheduled. In light of the potential merit to a complaint objecting to the dischargeability of the Claimants' claims against Debtor, the Court found re-opening the case warranted to permit the filing of such a complaint.

after that. *Id.* at ¶¶ 43-44. Eventually this led Ms. Watkins to terminate Debtor, resulting in Debtor advising Ms. Watkins that she owed an outstanding balance of $5,990.74. *Id.* at ¶¶ 45-46. Instead, Ms. Watkins allegedly advised Debtor by letter that she was requesting a refund of the $1,650 she had paid Debtor and that the paperwork Debtor had prepared in her case was "completely inadequate." *Id.* at ¶ 47. Debtor allegedly never responded and never returned the fee. *Id.* at ¶ 48.

The Amended Complaint avers that the Subrogated Claim Amounts, plus 10% interest per annum on the Subrogated Claim Amounts, are nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A), (a)(4), and/or (a)(7).[7] *Id.* at ¶¶ 56-71.

On January 25, 2021, Debtor, through Attorney Brown, filed a motion to dismiss the Amended Complaint ("Motion to Dismiss"), which the Fund opposed. Case No. 20-270 ECF 10, 14. On May 3, 2021, a hearing was held on the Motion to Dismiss. *Id.* at ECF 16. The same day, the Court entered an order granting the Motion to Dismiss for the § 523(a)(4) count as applied to Ms. Watkins, but otherwise denying the Motion to Dismiss. *Id.* at ECF 17. Thereafter, on May 25, 2021, the Debtor filed her answer to the Amended Complaint. *Id.* at ECF 19. The parties filed their joint pre-trial statement on November 24, 2021. *Id.* at ECF 72.

On March 11, 2022, Debtor filed a motion in limine seeking to exclude certain evidence from the trial record ("Debtor Motion in Limine"). *See id.* at ECF 109, 110. On April 1, 2022,

---

[7] Since neither the Claimants nor the Fund received notice or otherwise had actual knowledge of Debtor's bankruptcy filing, no motion to extend the deadline for filing a complaint objecting to the dischargeability of their claims was required. Pursuant to 11 U.S.C. § 523(a)(3)(B), any debt of a kind specified in § 523(a)(2) or (4) not scheduled in time to permit a timely request for a determination of dischargeability of such debt is excepted from discharge in the absence of notice or actual knowledge of the case. Relatedly, Federal Rule of Bankruptcy Procedure 4007(b) ("Rule 4007") provides that a dischargeability complaint other than under § 523(c) may be filed at any time. These provisions have the effect of excepting any debt which could fall under § 523(a)(2) or (4) from the deadline under Rule 4007 for objecting to discharge if the debt was not scheduled and the creditor did not have notice or actual knowledge of the case, as is the case here for the Fund. 4 Collier on Bankruptcy 16th Ed. ¶ 523.09 *Discharge Exception for Debts Not Duly Listed or Scheduled; § 523(a)(3)*. A complaint based upon § 523(a)(7) may be filed at any time. Fed. R. Bankr. P. 4007(b).

the Fund filed its own motion in limine seeking to exclude certain evidence from the trial record

("Fund Motion in Limine," collectively with "Debtor Motion in Limine," "Motions in Limine").

*See id.* at ECF 116, 117. On June 1, 2022, after a hearing on the Motions in Limine, the Court

entered an order granting in part and denying in part both Motions in Limine ("Motion in Limine

Order"). *Id.* at ECF 132, 133, 135. In pertinent part, the Motion in Limine Order determined,

*inter alia*, that evidence relating to legal work performed for Ms. Gregg and Mr. Joseph,

specifically timesheets, emails, pleadings drafted and filed, correspondence, contact logs, and

asset search memos ("Other Work Evidence"), should be excluded from the trial record "based

upon the application of collateral estoppel," for the reasons stated in the Motion in Limine Order,

which is incorporated herein by reference. *Id.* at ECF 135 ¶¶ 46, 47. Specifically, the Court

concluded that:

> [i]n the disciplinary proceedings related to the Gregg and Joseph matters, there
> was a final determination by the Disciplinary Board, adopted by the Supreme
> Court of Pennsylvania, on the merits after a hearing where [Debtor] testified, and
> where both [Debtor] and Disciplinary Counsel offered evidence into the record,
> that the Disciplinary Counsel proved by clear and satisfactory evidence that
> [Debtor] engaged in professional misconduct.
>
> The party against whom the doctrine is asserted – [Debtor] – was a party to the
> disciplinary proceedings relating to the Gregg and Joseph matters.
>
> Certain factual issues which [Debtor] appears to be attempting to relitigate
> through the submission of the Other Work Evidence are identical to those which
> this Court must consider and determine in the adversary proceeding.
> …
> In the disciplinary proceedings, [Debtor] could have defended against the
> allegations of the Disciplinary Counsel in connection with the Joseph matter by
> submitting evidence demonstrating their oral fee agreement and that she had
> performed work justifying the $10,000 she claimed he owed her and her holding
> onto Joseph's funds. She did not do so. [Debtor] now appears to attempt to prove
> she did not intend to deceive Joseph by submitting evidence that she performed
> other work for Joseph and earned those fees. The Report and Recommendation
> already determined that [Debtor] 'had done nothing to earn any of the fee in her
> possession.' [Debtor] had a full and fair opportunity to litigate that finding in the
> disciplinary proceedings, and the Court cannot now revisit that factual finding by

permitting into evidence in this adversary proceeding the Other Work Evidence related to Joseph.

With respect to Gregg,

…

[t]he Disciplinary Board for the Supreme Court of Pennsylvania already found that [Debtor] had agreed to represent Ms. Gregg in two matters for $1,500. She is now attempting to relitigate that finding through the introduction of the Other Work Evidence to prove that she did not have the requisite scienter in the Gregg matter because she actually performed other work for Gregg and had justification for withholding the settlement proceeds. [Debtor] could have defended against the disciplinary charges relating to Gregg by presenting evidence that she had performed other work for Gregg for which she was not paid, and/or by presenting evidence of costs she incurred in those other matters, thereby justifying the withholding of the $10,000 settlement. She did not do so despite having had a full and fair opportunity to litigate that finding in the disciplinary proceedings. The Court cannot now revisit that factual finding, which is a finding this Court would need to make in connection with the Plaintiff's nondischargeability claim against [Debtor] in order to assess her intent or if there was a justification for her behavior, by permitting into evidence in this adversary proceeding the Other Work Evidence relating to Gregg.

In sum, because the Debtor is collaterally estopped by the Report and Recommendation from relitigating findings relating to the extent of work she performed for Gregg and Joseph, the Other Work Evidence relating to Gregg and Joseph is not relevant, and will not be admitted at trial.

*Id.* at ECF 135[8] ¶¶ 49-55.

On August 25, 2022, trial was held and concluded over Zoom ("Trial"). *Id.* at ECF 151.

At Trial, Ms. Watkins appeared and testified respecting Debtor's representation. According to

Ms. Watkins' testimony, in 2014 she had asked Debtor to perform legal services on her behalf in

connection with a real estate matter involving real property located at 235 North Maple Avenue

in Delaware County, Pennsylvania ("Watkins Property"), hoping to recover approximately

$20,000. Trial Tr. 60:3-12, 61:10-13, 65:24-25. Ms. Watkins recalled that Debtor asked her to

---

[8] In the Motion in Limine Order, the Court determined for the reasons stated therein to exclude from evidence findings made in the Joint Petition in connection with Debtor's representation of Ms. Watkins. Case No. 20-270 ECF 135 ¶ 56. Accordingly, the Debtor would be permitted to introduce other work evidence relating to Ms. Watkins' case at trial.

pay a $1,500 retainer fee to undertake the representation, which Ms. Watkins paid, and that in

total, she paid Debtor $1,650, with the amount above $1,500 representing costs and filing fees.

*Id.* at 60:16-24. Accordingly, Debtor commenced a civil action in Philadelphia County Court of

Common Pleas on behalf of Ms. Watkins ("Watkins Civil Matter"). *Id.* at 61: 14-17; 87:8-10.

However, Debtor, who also appeared and testified at Trial, introduced a letter from

Debtor to Ms. Watkins dated October 22, 2015 whereby Debtor purported to notify Ms. Watkins,

*inter alia*, that she had an $8,500 balance and would need to continue her payment plan of

$500/month. Def. Ex. 13. Ms. Watkins had no recollection of ever receiving that letter and

testified she did not have a payment plan with the Debtor. Trial Tr. 74:6-11, 75:6-76:4. The

Debtor insisted at Trial that Ms. Watkins had agreed to pay $10,000 in connection with the

Watkins Civil Matter in installments of $500/month. *Id.* at 86:5-8. The Court finds Debtor's

contention that Ms. Watkins had agreed to pay $10,000 to pursue a $20,000 recovery lacking in

credibility, and, in contrast, finds Ms. Watkins' unequivocal representation that she would never

have paid $10,000 to collect $20,000 credible. *Id.* at 78:1-7.

Ms. Watkins testified that she attended one hearing in the Watkins Civil Matter in

Philadelphia City Hall where she witnessed the judge in the case inform the Debtor that she had

filed the action in the wrong jurisdiction. *Id.* at 61:14-21, 69:5-16, 70:25-71:1. Debtor confirmed

during her Trial testimony that at a hearing on December 14, 2015, Judge Fox of the Philadelphia

County Court of Common Pleas determined that the case needed to be transferred to the

Delaware County Court of Common Pleas since the Watkins Property was located in Delaware

County, Pennsylvania. *Id.* at 88:12-16, 91:25-92:3. *See also id.* at 76:24-77:12. Debtor testified

that she subsequently filed a petition to transfer the Watkins Civil Matter to the Delaware County

Court of Common Pleas, but that she never submitted any filings whatsoever in Delaware

14

County and did not cause any action to be opened in Delaware County. *Id.* at 88:16-22, 120:15-23. In fact, after filing the petition to transfer, Debtor ceased performing services in connection with the Watkins Civil Matter without seeking court permission to withdraw as counsel, explaining that Ms. Watkins terminated her. *Id.* at 61:25-62:2, 88:23-89:5, 120:15-121:6. However, Ms. Watkins testified that she had no idea why the Debtor did not further pursue the Watkins Civil Matter in Delaware County. *Id.* at 61:25-62:2, 71:6-12.

Ultimately, Ms. Watkins did not receive any of the $20,000 she had hoped to recover and eventually terminated Debtor, requesting a refund of the money she had paid for her representation.[9] *Id.* at 61:7-9, 62:3-9. Debtor did not refund Ms. Watkins any of the $1,650 she had paid her. *Id.* at 62:10-11.

Debtor essentially attributes the Claimants' dissatisfaction with her representation to their fundamental misunderstanding of the fee arrangements she had with them – despite the fact that, at least with respect to Mr. Joseph and Ms. Gregg, she did not raise this in connection with the proceedings before the Disciplinary Board. *See id.* at 96:3-11; 101:4-103:2, 104:1-8. The Court found her explanation of her fee arrangements inconsistent and confusing. While Debtor initially testified that when she was an attorney she charged fixed fees for her cases, she later testified that she still tracked time despite her standard fixed fee arrangements. *See id.* at 86:12-18, 89:14-90:14, 95:9, 100:6-22, 101:4-12. Debtor also testified that Mr. Joseph paid her the $2,500 as an initial retainer, and then claimed that she had charged Mr. Joseph $10,000 to represent him in his matter. *Id.* at 107:1-25. However, when questioned regarding the specifics of that $10,000

---

[9] The Court finds Debtor's testimony to the contrary completely lacking in credibility, particularly given that the Debtor also testified that she stipulated in connection with disciplinary proceedings related to Ms. Watkins' case that Ms. Watkins did ask her for a refund. Trial Tr. 123:5-15.

arrangement with Mr. Joseph on cross examination, Debtor struggled to recall the details of that

arrangement and how she communicated that arrangement to Mr. Joseph. *Id.* at 107:19-109:13.

Debtor confirmed at Trial that at the time that Mr. Joseph paid her $4,500 earmarked for

"sheriff fees," she did not put those funds in an IOLTA trust account and in fact, believes that

she did not have an IOLTA trust account. *Id.* at 113:18-24, 114:9-14. She conceded that she did

not spend any money on sheriff's fees for Mr. Joseph for collection on the Joseph Default

Judgment and admitted that she did not recall ever providing Mr. Joseph with an accounting of

the funds he had given to her. *Id.* at 114:16-18, 115:2-5. She also testified that she did not

remember whether she had put the settlement funds she received on behalf of Ms. Gregg into an

IOLTA trust account. *Id.* at 116:15-23.

At the conclusion of Trial, the parties established a schedule to submit post-trial briefing.

*Id.* at 125:15-126:18. All post-trial briefing was completed on November 15, 2022, and this

matter is ripe for disposition. Case No. 20-270 ECF 154, 155, 156.

## III.    DISCUSSION

As discussed, the Fund asserts three bases for the nondischargeability of Claimants'

claims - § 523(a)(2)(A), § 523(a)(4), and § 523(a)(7), based largely upon the findings in the

Report and Recommendation and Ms. Watkins' testimony at Trial in this adversary proceeding.

Debtor essentially contests that she acted with the intent required for a finding of

nondischargeability under § 523(a)(2)(A) and § 523(a)(4) during her representation of the

Claimants, attributing the losses they incurred instead to innocent misunderstandings and

miscommunication. She further argues that § 523(a)(7) cannot provide a basis for a finding of

nondischargeability because the amount she would need to pay the Fund under state law to

reinstate her law license constitutes compensation for actual pecuniary loss to the Fund.

16

Ultimately, the Court infers from the surrounding facts and circumstances as described in more detail below that Debtor during the course of her representation of all three Claimants did act with the intent required for a finding of nondischargeability under § 523(a)(2)(A) for false pretenses, and that all the other elements of a § 523(a)(2)(A) cause of action have been established by preclusive findings in the Report and Recommendation or evidence at Trial. Furthermore, the Court concludes with respect to Mr. Joseph's claim for the funds earmarked for sheriff's fees and with respect to the entirety of Ms. Gregg's claim that Debtor did defalcate funds entrusted to her care as a fiduciary with a conscious disregard for a substantial risk that her conduct violated her duty of care, thus rendering those claims nondischargeable under §523(a)(4). Finally, the Court finds that because the Debtor's obligation to reimburse the Fund for amounts paid out to her former clients serves a penal purpose, it does not constitute compensation for actual pecuniary loss, and is in fact a penalty owed to a governmental entity which is not compensation for actual pecuniary loss, thus rendering Mr. Joseph's claim, the only one paid out by the Fund pre-petition, plus 10% interest per annum, also nondischargeable under § 523(a)(7).

## A.  Applicable Legal Principles – 11 U.S.C. § 523(a)(2)(A)

In nondischargeability actions brought pursuant to § 523(a)(2)(A), the plaintiff bears the burden of proving the elements necessary for a § 523(a)(2)(A) claim by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991); *Oppenheimer & Co. v. Ricker (In re Ricker),* 475 B.R. 445, 455 (Bankr. E.D. Pa. 2012). Section 523(a)(2)(A) provides that:

> a discharge…under this title does not discharge an individual debtor from any debt[10]…for money, property, services, or an extension, renewal, or refinancing of

---

[10] Under 11 U.S.C. § 101(12), the term "debt" is defined as "liability on a claim." "Claim" is defined very broadly in 11 U.S.C. § 101(5)(A) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." The Court finds this incredibly broad definition of "debt" broad enough to encompass the Claimants' claims against

> credit, to the extent obtained by – (A) false pretenses, a false representation, or
> actual fraud, other than a statement respecting the debtor's or an insider's
> financial condition…

False representations, false pretenses, and actual fraud are distinct, yet related, concepts

which require plaintiffs to demonstrate similar elements to sustain a § 523(a)(2)(A) claim. *Husky

Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586-87 (2016); *Smith v. Johnson-Battle (In re

Johnson-Battle),* 599 B.R. 769, 783 (Bankr. D. N.J. 2019); *Coluccio v. Sevastakis (In re

Sevastakis),* 591 B.R. 197, 202 (Bankr. D. N.J. 2018); *Carto v. Oakley (In re Oakley),* 503 B.R.

407, 433 (Bankr. E.D. Pa. 2013). A § 523(a)(2)(A) claim based on a false representation requires

proof that the debtor made a false or misleading affirmative misrepresentation with the intention

and purpose of deceiving the creditor. *Green v. Didio (In re Didio)*, 607 B.R. 804, 816 (Bankr.

E.D. Pa. 2019). There are five elements comprising a false representation claim under

§523(a)(2)(A): (1) the debtor made a false representation; (2) which at the time of the

representation, the debtor knew, or believed, was false; (3) the false representation was made

with the intent and purpose of deceiving the creditor; (4) the creditor justifiably relied upon the

representation; and (5) the creditor sustained damages as a proximate result of the

misrepresentation. *In re Didio*, 607 B.R. at 816; *Jou v. Adalian (In re Adalian)*, 474 B.R. 150,

160 (Bankr. M.D. Pa. 2012).

---

Debtor even though disputed, based in part, on Debtor's contention that the statute of limitations had run on their claims. However, the Court is unable to determine from the record dates from which the statute of limitations may have run, including dates breaches of duties or contracts occurred, on which any negligent acts took place, or when any wrongdoing or fraud may have been discovered, particularly given that the Report and Recommendation does not reference such dates and the testimony at Trial lacked precision regarding those types of dates. Nevertheless, this is of no matter, as under Pennsylvania law, even a debt barred by the statute of limitations is not extinguished, rather, it is subject to an affirmative defense that can be waived. *Keeler v. PRA Receivables Mgmt., LLC (In re Keeler)*, 440 B.R. 354, 365 (Bankr. E.D. Pa. 2009) (J. Fox). To the extent that Debtor does have a valid statute of limitations defense to the Claimants' potential causes of action against her, any nondischargeability determination would not impact the validity of any defense she may choose to assert should the Fund attempt to assert any claim against her in state court based on the Claimants' claims.

While a § 523(a)(2)(A) claim based upon false representations requires express statements, a § 523(a)(2)(A) claim based on false pretenses "requires proof of an implied misrepresentation promoted knowingly and willingly that creates a misleading understanding of the transaction by the plaintiff." *LL Lifestyle, Inc. v. Vidal (In re Vidal)*, Bankr. No. 10–14071, Adv. No. 10–0335, 2012 WL 3907847, at *15 (Bankr. E.D. Pa. Sept. 7, 2012) (B.J. Fox). Some courts have determined that in order for a debt to be declared nondischargeable based on false pretenses, a plaintiff must prove that: (1) the debtor impliedly made a false representation or engaged in deceptive conduct; (2) at the time of the representation or conduct, the debtor knew, or believed, the implied representation was false or the conduct was deceptive; (3) the debtor acted with an intent and purpose of deceiving the creditor; (4) the creditor justifiably relied upon the representation or conduct; and (5) the creditor sustained damage as a proximate result of the misrepresentation or act. *In re Sevastakis,* 591 B.R. at 202; *Johnnie's Rest. & Hotel Serv. Inc. v. Witmer (In re Witmer),* 541 B.R. 769, 777 (Bankr. M.D. Pa. 2015); *In re Ricker*, 475 B.R. at 456-57.

Other courts have articulated those same essential elements slightly differently, finding that, to prove a § 523(a)(2)(A) claim based on false pretenses, the plaintiff must show that: "(1) the [defendant] made an omission or implied misrepresentation; (2) promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money…to the defendant." *In re Oakley,* 503 B.R. at 432; *In re Vidal*, 2012 WL 3907847 at *16.

Finally, actual fraud consists of any "deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetuating what is known to be a cheat or deception." *In re*

*Johnson-Battle,* 599 B.R. at 783. To except a debt from discharge for money, property, or

services obtained by actual fraud, a creditor must prove that a debtor took some action in

furtherance of his wrongful intent, that the fraudulent action enabled him to obtain money,

property, or services, and that the debt arose in the context of the fraudulent scheme. *Lepre v.*

*Milton (In re Milton),* 595 B.R. 699, 712 (Bankr. W.D. Pa. 2019).

### i.       Joseph Claim - § 523(a)(2)(A)

It appears that Debtor gave Mr. Joseph the impression that she would make efforts to

collect on the Joseph Default Judgment in exchange for payment in the amount of $2,500, plus

20% of any recovery on the Joseph Default Judgment. This turned out to be false or misleading,

as she never, in fact, made efforts to collect on the Joseph Default Judgment and, after March

2011, when she received the second sheriff's fee check from Mr. Joseph, stopped communicating

with him all together until he obtained new counsel. Mr. Joseph's reliance on her representation

that she would attempt to execute on the Joseph Default Judgment in exchange for the $2,500 fee

was justifiable, particularly since she had, in fact, performed under a prior agreement with Mr.

Joseph resulting in her securing the Joseph Default Judgment. Joseph clearly sustained damage

due to the false impression Debtor created, as he not only paid her the $2,500 fee, but also parted

with $4,500 earmarked for sheriff's fees to aide in execution of the Joseph Default Judgment.

The Court infers from the surrounding facts and circumstances – particularly that Debtor

did not place funds she received from Mr. Joseph into an IOLTA account as she was required to

do;[11] that she ceased all communication with him after receiving several thousand dollars from

him without offering any reason for doing so; that she never performed *any* services in

---

[11] *See* Pennsylvania Rule of Professional Conduct 1.15(i).

furtherance of collection on the Joseph Default Judgment;[12] that she did not provide Mr. Joseph

with an accounting of any of his funds or return them; and that she even attempted to claim

without *any* proof that he owed her $10,000[13] – that she knowingly intended to deceive Mr.

Joseph into paying her several thousand dollars for his matter without intending to perform the

services she promised.[14] Given Debtor's gross disregard of her duties in connection with making

efforts to collect the Joseph Default Judgment, all the elements for a section § 523(a)(2)(A) claim

based on false pretenses are satisfied and the debt based upon Debtor's misconduct in connection

with her representation of Mr. Joseph is nondischargeable.

### ii.    Gregg Claim - § 523(a)(2)(A)

It appears that Debtor gave Ms. Gregg the misleading impression, which turned out to be

false, that she would represent Ms. Gregg in the DirecTV matter for only $1,500 total. In reality,

Debtor claimed entitlement to and retained the entire $10,000 DirecTV settlement she secured on

Ms. Gregg's behalf based on an outrageous invoice for costs she never substantiated. That

Debtor to this day has retained the full proceeds from the settlement; has never produced

---

[12] The Court recognizes that at Trial Debtor testified that she did perform certain services in furtherance of executing on the Joseph Default Judgment. Unfortunately for Debtor, she could have raised that in connection with the disciplinary proceedings for the Attorney Discipline Petition and chose not to do so. The Report and Recommendation already concluded, based upon her own admissions, that "[Debtor] made no further efforts to enforce the judgment in favor of her client" and that "she had done nothing to earn any of the fee in her possession…" Pl. Ex. 5 ¶¶ 39, 42. As already discussed, Debtor is collaterally estopped from relitigating findings from the Report and Recommendation relating to the extent of work performed for Mr. Joseph.

[13] The Report and Recommendation, again, already determined based on Debtor's own admissions that "Debtor told Mr. Joseph that she would agree to collect the judgment for an additional fee of $2,500.00 plus a contingency fee of 20% of the gross amount collected on the judgment." Pl. Ex. 5 ¶ 34. The time to produce evidence of any $10,000 arrangement was the disciplinary proceedings in connection with the Attorney Discipline Petition. Debtor is now collaterally estopped from attempting to do so in this adversary proceeding. Furthermore, even if Debtor were not collaterally estopped from claiming that Mr. Joseph had agreed to pay her $10,000 to collect the Joseph Default Judgment, the Court did not find her testimony respecting that arrangement at all credible, given the inconsistencies between her Trial testimony and her deposition testimony respecting that arrangement and her complete inability to recall the specifics or how she communicated them to Mr. Joseph when questioned on cross examination at Trial. Trial Tr. 107:1-109:13

[14] Because a debtor will rarely, if ever, admit that deception was her purpose, knowledge and intent to deceive may be inferred from the totality of the surrounding facts and circumstances. *Fulton, N.A. v. Robbins (In re Robbins)*, 562 BR. 83, 109 (Bankr. E.D. Pa. 2016); *Giansante & Cobb, LLC v. Singh (In re Singh)*, 433 BR. 139, 161 (Bankr. E.D. Pa. 2010).

documentation substantiating the $22,000 invoice; did not "remember" putting the settlement proceeds into an IOLTA account; and completely cut off communication with Ms. Gregg after she collected the settlement other than to give her the $22,000 invoice without any supporting documentation suggests to the Court that she knowingly intended to deceive Ms. Gregg by giving her a misleading understanding of the legal transaction between them, allowing Debtor to ultimately retain thousands of dollars in settlement funds meant for Ms. Gregg. Ms. Gregg, in justifiable reliance on Debtor to properly represent her for the $1,500 fee, agreed to retain Debtor as her counsel, ultimately paving the way for Debtor to wrongfully retain the settlement funds which belonged to her.[15] Ms. Gregg had no basis to believe that Debtor would require more than the agreed upon fee of $1,500 to obtain her settlement funds from her, particularly in light of Debtor's ethical duties as an attorney to represent her competently,[16] clearly explain any fee arrangement,[17] and to hold separate from her own property and appropriately safeguard funds received from a third person in connection with a lawyer-client relationship or as a settlement agent.[18] Accordingly, all the elements for a § 523(a)(2)(A) claim for false pretenses are satisfied and the debt based upon Debtor's misconduct in connection with her representation of Ms. Gregg is nondischargeable.

---

[15] At Trial, Debtor testified that she charged Ms. Gregg $10,000 for representation in the DirecTV matter. Trial Tr. 100:13-14. Unfortunately for Debtor, she could have raised that in connection with the disciplinary proceedings for the Attorney Discipline Petition and chose not to do so. As previously explained, the Report and Recommendation already concluded, based upon her own admissions, that "[Debtor] agreed to charge Ms. Gregg $1,500.00 for the DirecTV matter." Pl. Ex. 5 ¶ 69. Debtor is now precluded from relitigating that finding.
[16] "A lawyer shall provide competent representation to a client." Pa. R. P. C. 1.1.
[17] "When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation." Pa. R. P. C. 1.5(b).
[18] See Pennsylvania Rule of Professional Conduct 1.15(b).

### iii.        Watkins Claim - § 523(a)(2)(A)

It appears that Debtor gave Ms. Watkins the misleading impression that she would competently represent Ms. Watkins in the Watkins Civil Matter in exchange for a $1,500 retainer fee plus costs. In reality, Debtor claimed entitlement to $10,000 for the Watkins Civil Matter, substantially more than the $1,500 retainer plus costs that she led Ms. Watkins to believe she had to pay, and simply stopped working on the case without warning. The Court infers from the fact that, without communicating with Ms. Watkins and without seeking court permission to withdraw as counsel, Debtor ceased all action in the Watkins Civil Matter after its transfer to the Delaware County Court of Common Pleas;[19] her ultimate refusal to return *any* of the $1,650 Ms. Watkins had paid for the Watkins Civil Matter; and her efforts to claim entitlement to substantially more than Ms. Watkins recalled agreeing to pay that Debtor knowingly intended to create a misleading impression of the legal transaction between them. Ms. Watkins' reliance on Debtor to represent her in the Watkins Civil Matter for the $1,500 retainer fee plus costs was justifiable given that they had entered into a legal representation agreement and that as an attorney, Debtor had ethical duties to represent her competently and diligently[20] and clearly explain any fee arrangement. Ultimately, Ms. Watkins was damaged by the false impression Debtor created that she would provide competent representation for a certain fee, which caused her to pay Debtor $1,650 only to have Debtor abruptly cease action in the case. Therefore, Debtor's actions satisfy the elements of a § 523(a)(2)(A) for false pretenses, and her debt regarding the Watkins claim should be excluded from discharge.

---

[19] While Debtor testified that Ms. Watkins terminated her immediately following the transfer of the Watkins Civil Matter to the Delaware County Court of Common Pleas, she had no recollection of the date the termination might have occurred, impairing her credibility in that regard. Trial Tr. 121:2-23. In contrast, Ms. Watkins testified that she had no idea why the Debtor did not pursue the Watkins Civil Matter in Delaware County, but eventually had to ask for the return of her retainer when no further action in the matter had been taken. *Id.* at 61:22-62:9, 71:6-12.
[20] See Pa. R. P. C. 1.3.

### B. Applicable Legal Principles – 11 U.S.C. § 523(a)(4)

Under § 523(a)(4), "[a] discharge under…this title does not discharge an individual debtor from any debt--for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The plaintiff-creditor objecting to discharge bears the burden of demonstrating the debt is nondischargeable by a preponderance of the evidence. *Gaussa v. Crawford (In re Crawford)*, 476 B.R. 890, 894-95 (Bankr. W.D. Pa. 2012). The Fund has invoked the first category under § 523(a)(4): the fiduciary prong. "To prevail under the fiduciary prong of § 523(a)(4), a plaintiff first must prove that the debtor was acting in a fiduciary capacity. Once the threshold fiduciary relationship has been established, a plaintiff must then prove fraud or defalcation." *Larson v. Bayer (In re Bayer)*, 521 B.R. 491, 500 (Bankr. E.D. Pa. 2014).

Historically, the term "fiduciary" has been construed narrowly for purposes of §523(a)(4), and "is not intended to apply to an ordinary commercial or contractual relationship," or encompass a mere agent or representative relationship. *In re Bayer*, 521 B.R. at 505-06. In fact, "[n]ot all persons treated as fiduciaries under state law are considered to 'act in a fiduciary capacity' for purposes of federal bankruptcy law." *Id.* at 506.

A fiduciary relationship exists under § 523(a)(4) if an express or technical trust which pre-existed the alleged defalcation or fraud is present. *Id.* The trustee's duties must be independent of any contractual obligation between the parties. *Universal Broadband Networks v. Sternberg, (In re Sternberg)*, Civ. Act. No. 09–2514(FLW), 2010 WL 988550, at *5 (D. N.J. March 12, 2010). Neither a constructive trust nor a resulting trust, each of which is imposed as a matter of law after the fact due to the conduct of the parties, creates a fiduciary relationship for purposes of § 523(a)(4). *In re Bayer*, 521 B.R. at 506-07. "An express trust is one 'created with

24

the settlor's express intent, usually declared in a writing'" and elements of an express trust under applicable non-bankruptcy law typically consist of "(1) a trust res; (2) a beneficiary; and (3) a trustee obligated to administer the res for the benefit of the beneficiary." *Id.* at 506-07. "A technical trust is usually described as one created by statute or common law," and a technical trust generally must "(1) define the trust res; (2) spell out the trustee's fiduciary duties to a beneficiary; and (3) impose the trust prior to and without reference to the wrong that created the debt." *Id.* at 506-07. Ultimately, for a fiduciary relationship to exist in the context of § 523(a)(4), money or property must have been entrusted to the debtor before the alleged misconduct occurred. *Kaps Construction v. Cruz-Brewer (In re Cruz-Brewer),* 609 B.R. 1, 8 (Bankr. M.D. Pa. 2019); *Pa. Lawyers Fund for Client Sec. v. Baillie (In re Baillie),* 368 B.R. 458, 469 (Bankr. W.D. Pa. 2007).

In the context of § 523(a)(4), fraud involves intentional deceit rather than implied or constructive fraud. *In re Didio*, 607 B.R. at 817. Defalcation refers to the failure to account fully for funds handled in a fiduciary capacity. *Id.* Defalcation occurs for purposes of § 523(a)(4) when a fiduciary misappropriates or fails to account for money or other property held in trust for another. *In re Baillie,* 368 B.R. at 469. Defalcation requires a level of scienter involving either intentionally wrongful conduct or gross recklessness. *Bullock v. BankChampaign, N.A.,* 569 U.S. 267, 273-74 (2013). In this context, gross recklessness refers to a conscious disregard or a willful blindness to a substantial and unjustifiable risk that the conduct at issue will violate the standard of care imposed on a fiduciary. *Id.* at 274. *See also In re Pearl*, 502 B.R. 429, 440–41 (Bankr. E.D. Pa. 2013).

i.    **Joseph Claim - § 523(a)(4)**

As Mr. Joseph's attorney, Debtor owed him certain fiduciary duties. At common law, an attorney generally owes a fiduciary duty to his or her client. *In re Baillie,* 368 B.R. at 471. "The attorney-client relationship, of course, can give rise to a fiduciary relationship within the meaning of § 523(a)(4) or an attorney might be a fiduciary by virtue of monies entrusted to him by his client." *Michener v. Brady (In re Brady),* 243 B.R. 253, 259 (E.D. Pa. 2000). However, although Debtor unquestionably owed a fiduciary duty to Mr. Joseph as his attorney, the Fund has not shown that Debtor was acting in a fiduciary capacity with respect to him when she refused to return his retainer fee. *See In re Baillie,* 368 B.R. at 471. "Nondischargeability based on the fiduciary relationship [with an attorney] is usually reserved for situations in which an attorney/debtor has been entrusted with funds or property." *Chaney v. Grigg (In re Grigg),* Bankr. No. 11–71206–JAD, Adv. No. 12–7008–JAD, 2013 WL 5771870, at *4 (Bankr. W.D. Pa. Oct. 23, 2013). The retainer fee by all accounts appears to have been a payment to secure Debtor's legal services to execute on the Joseph Default Judgment and no evidence was presented that the payment was *entrusted* to Debtor in the manner required by § 523(a)(4) rather than simply to secure her legal services per a contractual agreement. *See In re Baillie,* 368 B.R. at 471. Any obligation to return the retainer fee would have been the result of an agreement they had concerning what to do with the retainer fee if certain conditions were satisfied. *See id.* The failure to do so may be no more than the breach of a contractual obligation, not a fiduciary obligation. *See id.* Breach of a contractual obligation does not rise to the level of a breach of fiduciary duty owed to Mr. Joseph. *See id.*

With respect to the checks Mr. Joseph paid to Debtor for "sheriff fees" as indicated on the memo line of those checks, the Court concludes that a fiduciary relationship with respect to

the handling of those funds existed because Mr. Joseph apparently entrusted those funds to Debtor for the purpose of paying "sheriff fees" in connection with execution on the Joseph Default Judgment. That money was paid over to Debtor as Mr. Joseph's attorney in express trust for the purpose of paying any fees to the sheriff for that matter. *See Graves v. James (In re James),* 94 B.R. 350, 353 (Bankr. E.D. Pa. 1988) (J. Fox). Under such circumstances, the $4,500 earmarked for "sheriff fees" was the trust res from Mr. Joseph's perspective, and that res was to be administered by Debtor, as trustee, for Mr. Joseph, as beneficiary, to pay any fees to the sheriff incurred in connection with executing on the Joseph Default Judgment. *See id.* Accordingly, Debtor was acting in a fiduciary capacity with her handling of those funds.

Debtor's failure to return the funds to Mr. Joseph or otherwise provide him with an accounting of the use of those funds amounts to defalcation for purposes of § 523(a)(4), as her conduct of retaining funds intended for sheriff's fees for her own undisclosed purposes in a non-IOLTA account,[21] cutting off communication with Joseph after receiving those funds (until he obtained new counsel), and attempting to justify retention of those funds by claiming entitlement to a substantially higher fee based on nothing more than a supposed oral agreement reflects at the very least gross recklessness with respect to her handling of those funds,[22] causing Mr. Joseph economic loss. Therefore, the subrogated amount attributable to the $4,500 intended for sheriff's fees is nondischargeable under § 523(a)(4).

---

[21] Even this Court found Debtor's testimony respecting the funds Mr. Joseph earmarked for sheriff's fees incredibly difficult to follow, and cannot discern from her testimony any explanation of what she thought the funds were for or what she did with the funds. *See* Trial Tr. 107:4-10. Even when directly asked on cross examination at Trial what she did with the funds, she never actually addressed where the $4,500 went. *See* Trial Tr. 115:14-116:3.

[22] To the extent the Debtor believed that the $4,500 Mr. Joseph indicated should be applied toward sheriff's fees should be applied elsewhere, it was incumbent upon Debtor as the attorney to explain to Mr. Joseph where the $4,500 should be applied, rather than simply keep the funds without providing Mr. Joseph with any explanation. *See* Pa. R. P. C. 1.4, 1.5, 1.15.

### ii.   Gregg Claim - § 523(a)(4)

As for Ms. Gregg, Debtor was serving in a fiduciary capacity when she collected the

$10,000 settlement on Ms. Gregg's behalf. These settlement funds constituted the res expressly

entrusted to Debtor to be administered for Ms. Gregg as the beneficiary of the settlement

arrangement with DirecTV. Accordingly, Debtor was acting in a fiduciary capacity with respect

to her handling of the DirecTV settlement funds for purposes of § 523(a)(4). *See e.g., In re*

*Grigg,* 2013 WL 5771870, at *5-7.

Debtor engaged in defalcation while acting in a fiduciary capacity when she retained the

entire settlement amount and cut off communication with Ms. Gregg without providing Ms.

Gregg with any documentation substantiating the list of costs she claimed Ms. Gregg owed. This

conduct reflects Debtor's failure to fully account for these settlement funds and, at the very least,

willful blindness to a substantial risk that retaining the settlement funds without sufficiently

communicating with Ms. Gregg regarding the allocation of the settlement funds would violate

the standard of care owed by a fiduciary over those funds. Ultimately, "[a] debt arising out of an

attorney's mishandling of its client funds, will be nondischargeable under  523(a)(4)." *In re*

*Brady,* 234 B.R. at 660 (quoting *In re Kulzer Roofing, Inc.,* 139 B.R. 132, 139-40 (Bankr. E.D.

Pa. 1992)). Therefore, the Fund's claim on account of Ms. Gregg in the amount of $8,700 is

nondischargable under § 523(a)(4).

### C.  Applicable Legal Principles – 11 U.S.C. § 523(a)(7)

Pursuant to 11 U.S.C. § 523(a)(7), a debt is not discharged "to the extent such debt is for

a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not

compensation for actual pecuniary loss…" For a debt to be determined nondischargeable

pursuant to § 523(a)(7): (1) the debt must be for a fine, penalty, or forfeiture; (2) payable to and

for the benefit of a governmental unit; and (3) may not be compensation for actual pecuniary loss. *Tepes v. Sage (In re Sage),* 640 B.R. 377, 385 (Bankr. E.D. Pa. 2022).

Congress did not define "fine, penalty, or forfeiture" and so "we are left to give them their ordinary meanings, informed by the context in which they operate both within § 523(a)(7) and other provisions of the Bankruptcy Code." *Osicka v. Office of Lawyer Regulation,* 25 F.4th 501, 505-06 (7th Cir. 2022). A "fine" is "a pecuniary criminal punishment or civil penalty payable to the public treasury." *Id.* at 506. "A penalty is a 'punishment imposed on a wrongdoer' that can take the form of a 'sum of money exacted as punishment for either a wrong to the state or a civil wrong.'" *Id.*

Under 11 U.S.C. § 101(27), the term "governmental unit" "means Untied States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States…a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."

An "actual pecuniary loss is the disappearance or diminution of something having monetary value resulting from the real and substantial destruction of property, which usually occurs in an unexpected or relatively unpredictable way and often because of another's misconduct. Fraud is the classic example." *Osicka,* 25 F.4th at 507.  If a penalty serves some punitive or rehabilitative governmental aim, rather than a purely compensatory purpose, it satisfies the penal requirement under the statute that the penalty not be for a pecuniary loss. 4 Collier on Bankruptcy, ¶ 523.13[2], 16th Ed. "The mere fact that a penal sanction is calculated by reference to actual costs does not, in and of itself, transform the penalty into compensation for pecuniary loss." *Disciplinary Board v. Feingold (In re Feingold)*, 730 F.3d 1268, 1275 (11th Cir. 2013).

### i.    Pennsylvania Rule of Disciplinary Enforcement 531 and 11 U.S.C. § 523(a)(7)

Pursuant to Pennsylvania Rule of Disciplinary Enforcement 531 ("Rule 531"), entitled

"Restitution a Condition for Reinstatement":

> [t]he Board shall file with the Supreme Court a list containing the names of all formerly admitted attorneys with respect to the Dishonest Conduct of which the Board has made unrecovered disbursements from the Fund. No person will be reinstated by the Supreme Court under Rule 218 (relating to reinstatement), Rule 219 (relating to annual registration of attorneys), Rule 301(h) (relating to proceedings where an attorney is declared to be incapacitated or severely mentally disabled), Pennsylvania Rules for Continuing Legal Education, Rule 111(b) (relating to noncompliance with continuing legal education rules) or who has been suspended from the practice of law for any period of time, including, but not limited to suspensions under Rule 208(f) (relating to emergency temporary suspension) and 219(f) (relating to administrative suspension) until the Fund has been repaid in full, plus 10% per annum interest, for all disbursements made from the Fund with respect to the Dishonest Conduct of such person.

In applying the elements needed to prove a claim under § 523(a)(7), it is apparent that any debt

owed to the Fund by virtue of Rule 531 relating to Mr. Joseph is nondischargeable under

§523(a)(7).[23]

First, any obligation to reimburse the Fund pursuant to Rule 531[24] would constitute a

payment to a governmental unit. The Fund exists in the Administrative Office of Pennsylvania

Courts as a quasi-governmental agency and is funded by contributions from members of the

Pennsylvania Bar to ameliorate losses incurred by clients and others "caused by defalcating

---

[23] Because the Fund's claims in its own capacity under Rule 531 relating to Ms. Watkins and Ms. Gregg did not arise until after the Debtor filed this bankruptcy petition, § 523(a)(7) is not applicable to their claims. Only pre-petition debts are eligible for discharge except as provided in § 523 in a chapter 7 case, and thus, in the absence of a pre-petition debt, there can be no debt under § 523(a) which can be nondischargeable.  *See Symonies v. Sobol (In re Sobol)*, 545 B.R. 477, 490 (Bankr. M.D. Pa. 2016); *Dean v. Telegadis (In re Dean)*, 317 B.R. 482, 485 (Bankr. W.D. Pa. 2004). Because the Fund paid Ms. Gregg and Ms. Watkins after February 9, 2017—that is, post-petition—the Fund's right to payment under Rule 531 only arose post-petition, as no right to reimbursement under Rule 531 exists without those payments. Based upon the foregoing, § 523(a)(7) simply is not applicable to the Fund's Rule 531 post-petition claims relating to Ms. Gregg and Ms. Watkins.

[24] The Court recognizes that Debtor has not yet sought reinstatement. Trial Tr. 51:25-52:2. Nevertheless, contingent claims are expressly included in the definition of a "claim" set forth in 11 U.S.C. § 101(5)(A).

members of the Bar acting as attorney or fiduciary." *In re Baillie,* 368 B.R. at 465; Pa R. D. E.

502(a); Trial Tr. 7:18-22. The members of the Board of the Fund are appointed by the Supreme

Court of Pennsylvania. *In re Baillie,* 368 B.R. at 465; Pa. R. D. E. 503(a). Thus, any payment

which would be due to the Fund pursuant to Rule 531 should Debtor seek to reinstate her license

would be payable to and for the benefit of a governmental unit.

Second, the Court views conditioning a suspended attorney's reinstatement on making

restitution to the Fund with interest as a penalty that is not compensation for actual pecuniary

loss. While no case law addresses the precise issue of whether the condition to reinstatement

imposed under Rule 531 constitutes a fine, penalty or forfeiture that is not compensation for

actual pecuniary loss,[25] the Court finds particularly persuasive *Virginia v. Young (In re Young)*,

577 B.R. 227 (Bankr. W.D. Va. 2017), which concluded that the debtor, a disbarred attorney's,

obligation to reimburse the Virginia State Bar for amounts paid from its Client Protection Fund

to his harmed clients on account of his mishandling of attorneys' fees as a condition to the

reinstatement of his law license constituted a penalty that is not compensation for actual

pecuniary loss for purposes of § 523(a)(7). *In re Young,* 577 B.R. at 228-30, 232.

Like the Fund, the Virginia State Bar's Client Protection Fund was established to provide

a means of reimbursement for clients of attorneys harmed by an attorney's misconduct, and the

obligation to reimburse the Virginia State Bar was measured by the amounts that the Virginia

State Bar's Client Protection Fund paid to the debtor's former clients pursuant to a rule similar to

Rule 531 which, like Rule 531, provided that an attorney's license would not be considered for

reinstatement unless that attorney reimbursed the Bar's Client Protection Fund for any sums of

---

[25] Though the Court observes that many courts have held that costs of attorney disciplinary proceedings assessed against disciplined attorneys are nondischargeable under 11 U.S.C. § 523(a)(7). *Virginia v. Young (In re Young)*, 577 B.R. 227, 230 (Bankr. W.D. Va. 2017) (listing cases).

money paid as a result of the attorney's misconduct. *Id.* at 228-30. As persuasively explained by the *In re Young* court, "[t]he payment of the debt to the Fund in full is a mandatory condition that must be satisfied for the Debtor to reinstate his license. It is a protective measure designed to ensure that the Debtor complies with the requirements as necessary to show that he is fit to resume the practice of law, and thus it is a penalty designed to protect the public." *Id.* at 230. It is apparent that Rule 531 serves these same purposes, and thus for the same reasons, this Court concludes that the Debtor's obligation to reimburse the Fund plus 10% interest per annum pursuant to Rule 531 also constitutes a penalty for purposes of § 523(a)(7).

With respect to whether such an obligation represents compensation for actual pecuniary loss, as explained in *In re Young,* "[i]n order to determine whether the debt is compensation for actual pecuniary loss, courts have looked to the primary purpose of the debt[,]" and "[a]s several other courts have held in examining this element, '[e]ven where a debt is intended to help defray the expense of government, it may not be dischargeable if its primary purpose is penal.'" *Id.* at 231. In considering this element, the *In re Young* court concluded that the obligation to reimburse the Virginia State Bar's Client Protection Fund as a condition of reinstatement was "not just to compensate the Fund for costs but also a consequence to the Debtor for violations of ethical rules of conduct while he was a licensed attorney. This reinstatement order and its reimbursement obligation serves society's broader rehabilitative and penal goals and cannot be viewed narrowly as merely representing compensation to the victims." *Id.* at 232. The same applies to the obligation imposed here pursuant to Rule 531, and as such the Court concludes that it is not compensation for actual pecuniary loss.[26]

---

[26] The Court also observes that the Fund's use of its operating budget to reimburse wronged clients for an attorney's misconduct falls outside of the definition of "actual pecuniary loss" because the Fund simply expended money it had already allocated in furtherance of its public responsibility. *Osicka,* 25 F.4th at 507. The Fund's use of its operating budget neither resulted in any disappearance or diminution in value of, or destruction of property. Rather, paying the

Accordingly, based on the foregoing, all elements required for a finding under section 523(a)(7) that the debt owed to the Fund pursuant to Rule 531 on account of Mr. Joseph's claim, including the 10% interest per annum, is nondischargeable are present.

## IV.    CONCLUSION

Based on the foregoing, the Court concludes that the Fund's claim for Ms. Watkins is nondischargeable pursuant to § 523(a)(2)(A); that the Fund's claim for Ms. Gregg is nondischargeable pursuant to § 523(a)(2)(A) and § 523(a)(4); and that the Fund's claim for Mr. Joseph, plus 10% interest per annum, is nondischargeable pursuant to § 523(a)(2)(A), §523(a)(4), and § 523(a)(7).

Date: January 30, 2023

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

---

Claimants was simply part of the expense of governing and the exact use of the funds contemplated by Pennsylvania law. *See id.* "The cost of performing such a governmental function is not an actual pecuniary loss to the State" insofar as the Fund would perform its public function whether it could recoup the costs of reimbursing clients or not. *In re Feingold*, 730 F.3d at 1275-76.